IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:23-cr-32 |
| OSMAN KANU, | |
| Defendant. | |

FILED IN OPEN COURT
FEB 16 2023
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF FACTS

The United States and the defendant, Osman Kanu, stipulate that the allegations in the Criminal Information and the following facts are true and correct. The United States and the defendant further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

### Factual Background

**A. Unemployment Insurance**

1. Unemployment Insurance ("UI") is a joint state-federal program that is intended to provide temporary financial assistance to workers who become unemployed through no fault of their own and who meet certain eligibility requirements. Each state administers its own UI program through its state workforce agency ("SWA"), but all states follow the same guidelines established by federal law.

2. Individuals who have lost their jobs can apply to their SWA to receive UI benefits. If such an individual meets certain requirements, including having received a sufficient amount of wages (as reported by their former employer) prior to separation, they become eligible to receive UI benefits.

3. The SWAs receive and process applications for UI benefits via the internet through their respective websites. Such applications must include the claimant's personal identifying information, including their name, date of birth, Social Security number, address, and phone number, among other information.

4. After the SWA processes and authorizes the claim, a financial institution, pursuant to a contract with the state government, receives and disburses the authorized benefits, either by direct deposit into the account the claimant designates to receive such funds or onto a prepaid debit card mailed to the address included in the claimant's application for benefits.

5. Once their initial claim is approved, the claimant can then file to receive benefits on a weekly basis by certifying online that they remain unemployed and eligible for benefits. SWAs receive and process these certifications via the Internet through their respective websites. Based on the claimant's certifications, the SWA will continue to authorize payment of available UI benefits as described herein.

6. The SWA responsible for overseeing California's UI program is the Employment Development Department ("EDD").

7. California EDD UI benefits are credited only to prepaid debit cards issued pursuant to a contract between California EDD and Bank of America, N.A. ("BANA"). BANA is a federally insured financial institution, as defined in Title 18, United States Code, Section 20.

8. California EDD —through BANA— mails prepaid debit cards via the United States Postal Service ("USPS") to the physical address provided on the application for benefits. Each such card bears a unique card number alongside the claimant's name. This information, alone and in conjunction, is a means of identifying the claimant, as defined by Title 18, United States Code,

Section 1028(d)(7), and an access device, as defined by Title 18, United States Code, Section 1029(e)(1).

9. Only UI benefits can be credited to the prepaid debit cards issued by California EDD. Claimants can use such cards to make point-of-sale and retail purchases. Claimants can also transfer UI funds from those cards to another account and withdraw them in cash at automated teller machines ("ATMs").

**B.   Expansion of UI Benefits Due to COVID-19 Pandemic**

10. On March 13, 2020, the President of the United States declared a national emergency recognizing the threat that the novel coronavirus, known as SARS-Co V-2, and COVID-19, the disease caused by SARS-CoV-2, posed to the nation's healthcare systems. The President also determined that same day that the COVID-19 outbreak constituted an emergency, of nationwide scope, pursuant to section 50l(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), Title 42, United States Code, Section 5191(b).

11. On March 18, 2020, the President of the United States signed into law the Families First Coronavirus Response Act, which provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic.

12. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. It expanded states' ability to provide UI benefits for many workers impacted by the COVID-19 pandemic, including workers who are not ordinarily eligible for regular UI benefits.

13. Specifically, the CARES Act created the Pandemic Unemployment Assistance ("PUA") program. Under PUA, states are permitted to provide UI benefits during the COVID-19 pandemic to individuals who do not qualify for regular UI benefits, including business owners,

self-employed workers, independent contractors, those seeking part-time employment, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.

14. To qualify for PUA benefits, an individual must not be eligible for regular UI benefits and be unemployed, partially unemployed, or unable or unavailable to work because of certain specified health or economic consequences of the COVID-19 pandemic.

15. The CARES Act also established the Pandemic Emergency Unemployment Compensation ("PEUC") program. PEUC covers most individuals who have exhausted all rights to regular UI compensation under state or federal law and who are able to work, available for work, and actively seeking work as defined by state law. PEUC also gave states the flexibility to determine whether an individual was actively seeking work or if the individual was unable to search for work because of COVID-19, including because of illness, quarantine, or movement restrictions.

16. Finally, the CARES Act also established the Federal Pandemic Unemployment Compensation ("FPUC") program. FPUC allowed states to give an additional $600 per week to individuals collecting regular UI compensation, PEUC, PUA, and other approved state programs. FPUC benefits expired on July 31, 2020.

17. On April 18, 2020, the President further declared that a major disaster existed in all States and territories because of COVID-19, pursuant to section 401 of the Stafford Act, Title 42, United States Code, Section 5170.

18. On August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Funds for lost wage payments, in accordance with section

4

408(e)(2) of the Stafford Act, Title 42, United States Code, Section 5174(e)(2). The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia to administer delivery of lost wages assistance ("LWA") to those receiving UI benefits. For example, in California, the LWA provided an additional $300 per week to claimants who were eligible for at least $100 week in UI compensation. LWA remained available until the authorized funds were expended in or around December 2020.

## The Wire Fraud Scheme

19. From in or around August 2020, and continuing through on or about September 28, 2020, in Prince William County, Virginia, in the Eastern District of Virginia and elsewhere, OSMAN KANU, the defendant herein, knowingly devised and intended to devise a scheme and artifice to defraud and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice, and the execution thereof, operated in substance as follows:

20. For the duration of the wire fraud scheme, the defendant was a resident of Virginia. The defendant did not at any time live in California or qualify for California unemployment insurance benefits.

21. Despite being a resident of Virginia, the defendant chose to target California because he was aware that countless fraudsters were using stolen personal identifying information to submit thousands of fraudulent unemployment insurance claims to California. After learning of this, the defendant hatched his own scheme to defraud California EDD.

22. To this end, by at least in or around August 2020, the defendant began accessing darkweb sites to purchase the personal identifying information of real U.S. citizens, including their dates of birth, social security numbers, and other information. The defendant purchased this

information with the intent of submitting fraudulent claims for unemployment insurance with the California EDD.

23. Between in or around August and September 2020, the defendant submitted at least 15 false initial unemployment insurance applications to California EDD. On each of these applications, the defendant made knowingly false statements and false certifications to mislead California, EDD, including, but not limited to, the following misrepresentations:

   a. Falsely submitting applications with the names and personal identifying information of real individuals, without their permission or consent;

   b. Falsely certifying that he was the individuals in whose names the applications were submitted;

   c. Falsely certifying the individuals' employment history and unemployment status;

   d. Falsely certifying that the individuals, in whose names the applications were submitted, would receive the UI benefits; and

   e. Falsely certifying the individuals' home address.

24. When submitting the false initial and subsequent weekly unemployment insurance claims to the California EDD, the defendant caused wires to be sent from within the Eastern District of Virginia and elsewhere to California EDD located in California.

25. At least 15 of the unemployment insurance applications submitted by the defendant were approved and funded, resulting in California EDD disbursing through BANA at least $308,400 in proceeds to prepaid debit cards. These debit cards were sent to addresses located in California. The defendant then retrieved these debit cards and/or caused another individual to retrieve these debit cards on his behalf.

26. Once the defendant received the debit cards, he began to withdraw large amounts of cash from ATMs located in the Eastern District of Virginia and California. Specifically, between on or about September 1 and September 28, 2020, the defendant withdrew approximately $178,000

in cash from ATMs, beginning at various BANA locations in Los Angeles and Hollywood, California, and culminating in Arlington, Virginia. The defendant was unable to withdraw the rest of the funds because law enforcement seized the prepaid debit cards when he was arrested on September 28, 2020.

27. During this period, the defendant used an internet-connected device to file or cause to be filed the initial 15 fraudulent unemployment applications with California EDD. Each application was for unemployment benefits dating back to the week of April 4, 2020, which was toward the start of the pandemic. Typically, the defendant filed the back weekly certifications on the same day. Specifically, the defendant falsely certified that he was the claimant, and that the claimant was physically able to work, available for work, and ready and willing to accept work immediately; however, the claimant was unable to work owing to one or more COVID-19-related reasons. When submitting the initial applications and weekly certifications to California EDD, the defendant caused wires to be sent from within the Eastern District of Virginia and elsewhere to the California EDD located in California. The California EDD relied on the truthfulness of the information submitted by the defendant to determine the claimant's eligibility for unemployment insurance benefits.

28. For example, on or about August 27, 2020, the defendant used an internet-connected device to file an initial UI application with California EDD in the name of "J.B." whose personal information was acquired and possessed by the defendant. In this application, the defendant falsely stated that he was J.B. and that J.B. lived at an address in Los Angeles, California, and had been self-employed in California. Thereafter, on or about August 29, 2020, from approximately 5:12 to 5:19 P.M. EST, the defendant used an internet-connected device to file approximately 20 certifications for weeks ending on April 4 to August 15, 2020, which falsely certified that J.B. was

still unemployed due to a COVID-19-related reason and still eligible to receive unemployment benefits. As a direct result of the initial claim and follow-up certifications made by the defendant, from on or about August 30 to September 18, 2020, CA EDD funded approximately $20,100 through BANA prepaid debit card issued in the name of J.B.

### Execution of Scheme and Artifice to Defraud

29. For the purpose of executing the aforesaid scheme and artifice to defraud, the defendant routinely caused wire transmissions in interstate commerce, including wire transmissions of unemployment insurance applications and certifications made by the defendant while located within the Eastern District of Virginia to the California EDD located in California.

30. For example, on or about August 27, 2020, for the purpose of executing and attempting to execute the scheme and artifice described above, the defendant caused to be transmitted by means of wire communication in interstate commerce the signs, signals, and writings described herein: a false and fraudulent unemployment insurance application in another individual's name, J.B., and using their personal identifying information, from within the Eastern District of Virginia to California EDD located in California.

### The Defendant's Arrest

31. The defendant would have continued his scheme to defraud California EDD for the eligible period, which would have caused California EDD to fund his 15 fraudulent claims until September 1, 2021. However, the defendant's scheme was thwarted by law enforcement when he was arrested on September 28, 2020.

32. On September 28, 2020, an Arlington County Police Department patrol officer conducted a traffic stop of the defendant's vehicle for speeding on Washington Blvd., at the Pentagon, in Arlington County, Virginia. During a consent search of the defendant's vehicle, the

patrol officer subsequently located a black zipper bag on the front passenger seat. Inside of the black zipper bag, the officer located a loaded firearm and approximately $15,000 in cash. After locating the weapon and the money, the officer placed the defendant in handcuffs and advised the defendant of his constitutional rights.

33. After the defendant waived his rights, the defendant claimed to be a shoe seller and that the cash was "hard earned." In fact, the defendant had just withdrawn this cash from ATMs using the BANA prepaid debit cards. The defendant was then placed under arrest for carrying a concealed weapon, in violation of Code of Virginia Section 18.2-308. These charges were subsequently dismissed in favor of federal prosecution.

34. The patrol officer conducted a search of the defendant's person incident to his arrest. The patrol officer removed the defendant's wallet from his front pocket to retrieve his identification. While searching the wallet for identification, the officer located 15 Visa debit cards, with different names on each of them, none of which said "Osman Kanu." When asked about the debit cards, the defendant first stated that the debit cards belonged to his friends; however, he was unable to identify any names on the debit cards. The defendant then claimed that he found the debit cards. The defendant also repeatedly and falsely stated that he was not involved in any fraudulent activity.

35. After being taken to the Arlington County Detention Center, the defendant made several phones calls while inside of his holding cell. Prior to engaging in discussions on these calls, he was warned that there was no right to privacy and that his calls could be monitored. In one of these calls, the defendant informed an individual ("Individual 1"), that law enforcement found 15 cards or "joints" from "the O.C." in his possession and that the defendant expected he "might do two or three years." The defendant also pleaded with Individual 1 to go to the defendant's residence

and remove some items, which the defendant suggested were shoes from his closet. The defendant stated in return for Individual 1's help, "I got you, I'mma look out for you. You gotta do this for me right now." The defendant also repeatedly asked Individual 1 to contact and warn a woman about the seizure of the cards so that she could "get situated." The defendant resided with this woman.

## Total Loss Amount

36. The total intended loss for the 15 fraudulent unemployment insurance claims was $628,708, which, pursuant to USSG 2B1.1(b)(1)(H), results in a 14-point increase in the base offense level. This number reflects that the defendant, but for his arrest, would have continued to falsely certify that the claimants were entitled to unemployment insurance benefits. California EDD would have relied on this information and paid out to 14 claimants $45,600 each, and to one claimant $44,308.

37. In total, California EDD funded $308,400 to the prepaid debit cards.

38. In total, the defendant withdrew and/or spent $178,000 from the prepaid debit cards between late August and September 2020.

39. The defendant filed other false unemployment insurance applications with California and other states.

## Sentencing Enhancements

40. The defendant used the personal identifying information of at least 15 real U.S. citizens to submit fraudulent unemployment insurance claims to California EDD. The victims did not provide the defendant permission to use their personal identifying information to submit these claims. Pursuant to USSG 2B1.1(b)(2)(A)(i), this results in a two-point increase in the base offense level.

41. The defendant received 15 prepaid debit cards via the USPS to physical addresses located in California. Each card bore a unique card number alongside the claimant's name. This information, alone and in conjunction, is a means of identifying the claimant, as defined by Title 18, United States Code, Section 1028(d)(7), and an access device, as defined by Title 18, United States Code, Section 1029(e)(1). Pursuant to USSG 2B1.1(b)(11)(C)(i) and (ii), this results in a two-point increase in the base offense level.

42. As previously stated, the defendant's fraudulent scheme resulted in him unlawfully and directly obtaining $178,000 from California EDD. The California EDD funds loaded on the prepaid debit cards were derived from PUA, FPUC, and LWA. FEMA provided the LWA funds from its Disaster Relief Fund to California and these funds represent funds made available after the President of the United States declared a major disaster existed in all States and territories as a result of COVID-19. Thus, pursuant to USSG 2B1.1(b)(12), the defendant's fraudulent scheme involved major disaster benefits, which results in a two-point increase in the base offense level.

### Conclusion

43. This Statement of Facts includes those facts necessary to support the plea agreement between the defendant and United States. It does not include each and every fact known to the defendant or United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

44. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

45. This Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against the defendant regardless of whether the plea agreement is presented to or accepted by the Court. Moreover, the defendant waives any rights that he may have under Fed.

R. Crim. P. 11(f), Fed. R. Evid. 401, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____
Carina A. Cuellar
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Osman Kanu, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Osman Kanu

I am Sean Sherlock the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Sean Sherlock, Esq.
Attorney for Osman Kanu